IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

TANYA M. WILSON, )
 )
        Plaintiff, )
 )
v. ) Case No. CIV-08-374-FHS
 )
MICHAEL J. ASTRUE, )
Commissioner of Social )
Security Administration, )
 )
        Defendant. )

**REPORT AND RECOMMENDATION**

Plaintiff Tanya M. Wilson (the "Claimant") requests judicial review of the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Claimant's application for disability benefits under the Social Security Act. Claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled. For the reasons discussed below, it is the recommendation of the undersigned that the Commissioner's decision be REVERSED and REMANDED for further proceedings.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . ." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social

Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . ." 42 U.S.C. §423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. *See*, 20 C.F.R. §§ 404.1520, 416.920.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal

---

[1] Step one requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921. If the claimant is engaged in substantial gainful activity (step one) or if the claimant's impairment is not medically severe (step two), disability benefits are denied. At step three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to step four, where claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's step four burden is met, the burden shifts to the Commissioner to establish at step five that work exists in significant numbers in the national economy which the claimant – taking into account his age, education, work experience, and RFC – can perform. Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. *See generally*, Williams v. Bowen, 844 F.2d 748, 750-51 (10th Cir. 1988).

standards were applied. Hawkins v. Chater, 113 F.3d 1162, 1164 (10th Cir. 1997)(citation omitted). The term "substantial evidence" has been interpreted by the United States Supreme Court to require "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court may not re-weigh the evidence nor substitute its discretion for that of the agency. Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991). Nevertheless, the court must review the record as a whole, and the "substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); *see also*, Casias, 933 F.2d at 800-01.

### Claimant's Background

Claimant was born on June 10, 1973 and was 34 years old at the time of the entry of the ALJ's decision. Claimant completed her education through the tenth grade, received her GED, and attended two years of college. Claimant has worked in the past as an equipment operator. Claimant alleges an inability to work beginning July 29, 2002 due to depression, bipolar disorder, schizoaffective disorder, paranoia, kleptomania, auditory and

visual hallucinations, leg and back pain, left knee problems, right elbow problems, and sleep problems.

## Procedural History

On July 18, 2005, Claimant protectively filed for disability insurance benefits under Title II (42 U.S.C. § 401, et seq.) of the Social Security Act and supplemental security income benefits pursuant to Title XVI of the Social Security Act (42 U.S.C. § 1381, et seq.). Claimant's application was denied initially and upon reconsideration. On December 6, 2007, a hearing was held before ALJ Jeffrey Wolfe in Sallisaw, Oklahoma. By decision dated March 14, 2008, the ALJ found that Claimant was not disabled during the relevant period. On August 19, 2008, the Appeals Council denied review of the ALJ's decision. As a result, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. He determined that while certain of Claimant's medical conditions were severe, Claimant did not meet a listing and retained the residual functional capacity to perform a full range of medium work.

## Errors Alleged for Review

Claimant asserts the ALJ committed error in: (1) failing to

properly evaluate the opinions of a treating physician; (2) ignoring certain vital probative medical evidence contained in Claimant's medical records.

### Treating Physician's Opinion

Claimant asserts the ALJ improperly rejected the opinions of Dr. Robert Hensley. On July 29, 2002, Claimant suffered injuries in a single car automobile accident. She was treated for head trauma, a scalp laceration, and a fracture of the tibia bone in her left leg. She was noted to be agitated and had to be sedated and intubated. X-rays revealed her lumbar spine had small anterior-superior corner fractures with minimal anterior wedging of her superior endplates at both L1 and L2. (Tr. 102). Claimant's lumbar spine x-rays showed a 10 to 20 percent loss of vertebral body height and depression of the superior endplates. Claimant was also thought to have a possible skull fracture. Id.

On August 1, 2002, while still in the hospital from the accident, a psychiatric evaluation of Claimant was performed by Dr. J. Marie Bullitt. Dr. Bullitt found Claimant had made a statement two days prior to the accident that life was not worth living. Dr. Bullitt questioned whether the accident in which Claimant was injured was really an accident. Claimant denied suicidal ideation, stating she only made the statement to her father to get sympathy. She denied symptoms of depression. Dr. Bullitt concluded

5

Claimant's affect was somewhat irritable about being interviewed and seemed manipulative at times, but that she was generally cooperative. Dr. Bullitt's diagnosis was at Axis I: Rule out adjustment disorder with depressed and anxious mood - possible substance abuse/dependence; Axis II: Deferred; Axis III: Left tibia fracture - L1-2 compression fracture; Axis IV: Lack of primary support; Axis V: GAF of 60-70. (Tr. 104).

On July 21, 2004, Claimant requested medication for anxiety from the Redbird Clinic. Claimant was seen by Ms. A. Walker, a physician's assistant. Ms. Walker treated Claimant with Atarax. Ms. Walker noted Claimant had a hypomanic, anxious affect and diagnosed her with bipolar disorder, type I, by history. Claimant was referred to behavioral health services and was treated with medication including Clonazepam, Prozac, and Trazodone. (Tr. 175-76).

On March 7, 2005, Claimant sought refills on her medication for her bipolar disorder as well as further treatment for a fractured elbow. (Tr. 167-68).

On March 27, 2005, Claimant sought treatment at the Bill Willis Community Mental Health and Substance Abuse Center, stating she was experiencing extreme highs and lows with cycles that sometimes lasted for weeks. Claimant reported that she was paranoid regarding the government and had tried to commit suicide

five or six times by slitting her wrists. Claimant also stated she was experiencing auditory hallucinations, stating she "talked to them," as well as visual hallucinations, reporting she had "Indian heritage visions." The counselor at Bill Willis reported Claimant had flight of ideas, confusion, obsessive thoughts, and was paranoid. She was agitated, cooperative, anxious, tearful and withdrawn, "like a hermit." (Tr. 218-19). Claimant told her counselor that she spent money and drove fast. She also stated that she had been a patient in a mental institution in Texas in the last year for two months. (Tr. 220).

On April 1, 2005, Claimant was described by her counselor as very nervous during their counseling sessions. Claimant reported problems with depression, anxiety, hallucinations, and suicidal ideations. (Tr. 216). On April 7, 2005, Claimant sought and obtained medications but reported to her counselor that they were ineffective. (Tr. 214-215).

On April 18, 2005, Claimant sought medication for anxiety. Her physician stated Claimant was easily distracted and verbose. He diagnosed Claimant as bipolar and treated her with medication. (Tr. 166).

On May 31, 2005, Claimant entered into counseling sessions at Bill Willis. She stated she had had three episodes since her last session. She stated she could not leave her house but had been

gardening. She also reported that she had been hearing alternating male and female voices coming from outside herself which tell her she is not doing something right or going against her judgment. Claimant told her counselor her medication was not helping. (Tr. 212).

On June 6, 2005, Claimant sought treatment from Dr. Robert V. Hensley. He noted Claimant had a history of chronic psychotic disorder with hallucinations, a history of trauma, and a history of substance abuse. She complained about the hallucinations and not sleeping well with some depression. She denied suicidal or homicidal ideations. Dr. Hensley found Claimant to be hypertalkative but not manic. (Tr. 211).

On June 9, 2005, Claimant continued her counseling sessions at Bill Willis. She reported hearing voices and experiencing anxiety. (Tr. 210).

On June 15, 2005, Claimant reported she suffered one episode of auditory hallucination during the prior week. (Tr. 209). On June 22, 2005, Claimant discussed her paranoia with her counselor, who indicated she "appeared to be in a manic state" by fidgeting and rambling. Id.

On June 27, 2005, Claimant had a follow-up appointment with Dr. Hensley. She reported that medication had improved her moods but that she "had been a little more manic than anything." She

8

denied suicidal or homicidal ideations, denied audio or visual hallucinations but continued to complain of anxiety. (Tr. 207).

On July 27, 2005, Claimant stated she was having conversations with auditory hallucinations, "but states they have been positive and she enjoys them." Id.

On August 8, 2005, Claimant was attended by Dr. Hensley. She reported that she was doing much better overall. Her hallucinations had decreased by were still occurring from time to time. She was not as depressed, seemed anxious where she could not sit still or relax. She stated she was sleeping at night with the aid of medications. Dr. Hensley diagnosed Claimant with Depression NOS, Psychosis NOS, rule out Bipolar Disorder NOS. (Tr. 206).

On October 17, 2005, a consultative physical examination was performed by Dr. Jimmie W. Taylor. Dr. Taylor determined Claimant suffered from bipolar disorder, a possible cyst of her right elbow, degenerative joint disease of the left knee, degenerative joint disease of the low back, degenerative joint disease of the right elbow, anxiety disorder, and herpes. Dr. Taylor recommended a psychological consult. (Tr. 177-179).

On October 19, 2005, Claimant underwent a consultative psychological evaluation by Dr. Robert L. Spray, Jr. Dr. Spray noted Claimant's history of suicide attempts and prior mental health treatment and evaluation. After her vehicle accident,

Claimant reported that when she returned to work, she cried on the job and believed everyone was out to get her. She also had physical problems performing the job. Claimant reported hallucinations where she talked to "friends" who she sometimes saw and sometimes only heard. She stated the voices told her "that's not right, you're not doing it right," or "that's perfect, that's a good job." Occasionally, Claimant sees black shadows. She also felt "like people speak with their hands instead of their mouths. I don't understand what they are saying. I feel that anxiety all the time."

Dr. Spray found Claimant's affect was appropriate and variable. Her mood was better while on medication but she still has "angry fits." She found she was more angry than depressed. Dr. Spray diagnosed Claimant at Axis I: Bipolar I Disorder, depressed phase - Rule out Bipolar Disorder, schizoaffective type - Polysubstance abuse in very early remission; Axis II: Paranoid Personality Features. Dr. Spray did not expect Claimant's condition to improve significantly within the next twelve months and has some potential for decompensation. (Tr. 184-186).

On November 9 and 11, 2005, Claimant continued her counseling sessions at Bill Willis. She reported cycles in her mood due to her being off her medications. Claimant denied suicidal or homicidal ideations. (Tr. 203).

On November 19, 2005, Claimant saw Dr. Hensley once again, informing him that she had been out of her medications for two weeks. Dr. Hensley found Claimant's affect to be anxious. (Tr. 201).

On November 28, 2005, Dr. Hensley authored a note stating Claimant "is unable to work due to her mental illness." (Tr. 200).

On November 30, 2005, Claimant reported to her counselor that she had suffered one episode of auditory hallucinations. Otherwise, her moods had been stable. Id.

On December 29, 2005, Claimant informed Dr. Parvez at Bill Willis that she was still hearing voices and "it scares me." She also had a problem with stealing, mostly money from her parents. She stated she sometimes feels down with suicidal ideations. Dr. Parvez diagnosed Claimant with schizoaffective disorder, kleptomania, and alcohol dependence. (Tr. 196-97).

On February 22, 2006, Claimant attended a counseling session at Bill Willis. She reported to her counselor that she was still having trouble with stealing. (Tr. 193). Claimant told Dr. Daber at Bill Willis that her medications were working but that she still felt like stealing from her parents. She reported feeling euphoric, acting impulsively with regard to sex and spending. Dr. Daber diagnosed Claimant with mood disorder, NOS; rule out bipolar II disorder; and impulse control disorder, NOS. (Tr. 191).

11

Claimant continued to suffer problems associated with the fracture of her elbow and was attended by Dr. Chris Deloache for the condition. She had a deformity from a displaced olecranon fracture and weakness in the elbow. She was scheduled for surgery. (Tr. 238). However, the surgery was not approved. Claimant's range of motion was reduced with marked weakness with the extension of her right elbow. (Tr. 237). On April 4, 2007, Claimant underwent an open reduction and internal fixation with bone grafting procedure on her right elbow fracture. By an April 26, 2007 visit, Claimant had full extension, supination, and pronation of her right elbow with flexion of ninety degrees. (Tr. 235, 239-40).

On May 22, 2007, Claimant's mother was appointed as her guardian by court order. The basis for the appointment was that Claimant was "incapacitated by reason of mental illness and is unable to care for herself and has some limited income without assistance." (Tr. 92-95).

In his decision, the ALJ found Claimant had the severe impairments of Depression - Bipolar Type; Generalized Anxiety Disorder; Status Post Open Reduction Internal Fixation with Bone Grafting of the Right Elbow; Degenerative Joint Disease, Lumbar Spine; and Degenerative Joint Disease of the Left Knee. (Tr. 12). He also concluded Claimant only had mild restrictions on daily

living, and social functioning. He found moderate restrictions on concentration, persistence or pace and no episodes of decompensation. (Tr. 13).

The ALJ determined Claimant had marked limitations in the ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to interact appropriately with the general public, and retained the ability to perform only simple tasks with routine supervision and can interact with others on a superficial level. (Tr. 14).

Claimant contends the ALJ failed to consider Dr. Hensley's assessment contained in the note which stated Claimant could not work due to mental illness. Nowhere in the ALJ's opinion does he even mention Dr. Hensley save for one oblique comment that "Ms. Wilson's treating physicians did not place any functional restrictions on his (sic) activities that would preclude work activity with the previously-mentioned restrictions." (Tr. 18). In light of Dr. Hensley's notation, brief though it may be, the ALJ's statement is erroneous. Clearly, Dr. Hensley's relationship with Claimant establishes him as a treating physician.

In deciding how much weight to give the opinion of a treating physician, an ALJ must first determine whether the opinion is entitled to "controlling weight." Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003). An ALJ is required to give the

opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) "consistent with other substantial evidence in the record." Id. (quotation omitted). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

Even if a treating physician's opinion is not entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." Id. (quotation omitted). The factors reference in that section are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. Id. at 1300-01 (quotation omitted). After considering these factors, the ALJ must "give good reasons" for the weight he ultimately assigns the opinion. 20 C.F.R. § 404.1527(d)(2); Robinson v. Barnhart, 366 F.3d 1078, 1082 (10th

Cir. 2004)(citations omitted). Any such findings must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason for that weight." Id. "Finally, if the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." Watkins, 350 F.3d at 1301 (quotations omitted).

The ALJ did not consider Dr. Hensley's opinion or discuss any weight given to it. Moreover, this Court specifically rejects Defendant's contention that a broad, unspecific reference to the ALJ having considered the medical evidence in the record necessarily means he considered Dr. Hensley's opinion. When a treating physician renders an opinion, the ALJ is required to discuss that opinion specifically as discussed in Watkins. The ALJ failed in his obligation to do so.

### Probative Evidence

In assessing her RFC, Claimant contends the ALJ failed to consider the low GAF of 45 which was given to Claimant by medical personnel. She also takes issue with the ALJ's selective incorporation of evidence that only supported a finding of non-disability rather than other evidence which supported Claimant's inability to maintain work.

Certainly, it is well-recognized in this Circuit that an ALJ

15

is not required to discuss every piece of evidence. Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996). However, he is required to discuss uncontroverted evidence not relied upon and significantly probative evidence that is rejected. Id. at 1010. An ALJ "is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." Haga v. Astrue, 482 F.3d 1205, 1208 (10th Cir. 2007).

The ALJ failed to reference any of the multitude of episodes of hallucinations, her continuing anxiety noted by medical professionals, or the fact that Dr. Spray found decompensation a real possibility. Instead, the ALJ focused on alcohol and drug use and "partying" as evidenced by his repeated italicizing and bolding such comments. He did not, however, rely upon alcohol and drug use to deny benefits. On remand, the ALJ shall evaluate the totality of the evidence in assessing Claimant's RFC.

## Conclusion

The decision of the Commissioner is not supported by substantial evidence and the correct legal standards were not applied. Therefore, the Magistrate Judge recommends for the above and foregoing reasons, the ruling of the Commissioner of Social Security Administration should be **REVERSED** and the case be **REMANDED** for further proceedings consistent with this Report and

Recommendation. The parties are herewith given ten (10) days from the date of the service of these Findings and Recommendations to file with the Clerk of the court any objections, with supporting brief. Failure to object to the Findings and Recommendations within ten (10) days will preclude appellate review of this decision by the District Court based on such findings.

DATED this 14th day of January, 2010.

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE